2023R00275/KMR

**FILED**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

SEP 1 2 2023

AT 8:30
CLERK, U.S. DISTRICT COURT - DNJ

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| v. | : | Crim. No. 23-726 (ES) |
| | : | |
| WILLIAM B. WELWART, | : | 18 U.S.C. § 1349 |
| ETHAN B. WELWART, and | : | 18 U.S.C. § 1347 |
| GARY KACZKA | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 371 |
| | : | 42 U.S.C. § 1320a-7b(b)(2)(A) |
| | : | 18 U.S.C. § 2 |
| | : | |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

### COUNT 1
(Conspiracy to Commit Health Care Fraud and Wire Fraud)

1.    At all times relevant to this Indictment, unless otherwise indicated:

#### The Defendants and Others

a.    WILLIAM B. WELWART was a resident of Staten Island, New York. WILLIAM WELWART owned, operated, and served as Chief Executive Officer of Apogee Bio-Pharm LLC ("Apogee"), a pharmacy located in Edison, New Jersey that purportedly did business throughout the United States by filling prescriptions and delivering them to patients.

b.    ETHAN B. WELWART was a resident of North Brunswick, New Jersey.  ETHAN B. WELWART was Director of Operations at Apogee, and later an owner of Aberdeen Pharmacy ("Aberdeen"), a pharmacy purportedly located in Bal Harbor, Florida, and Incline Health LLC ("Incline"), a pharmacy purportedly located

in Oceanport, New Jersey. Aberdeen and Incline, like Apogee, did business throughout the United States by filling prescriptions and delivering them to patients.

c. GARY KACZKA was a resident of Saddle Brook, New Jersey and a licensed pharmacist who worked for Apogee. At times, KACZKA served as the Pharmacist-in-Charge at Apogee.

d. Co-Conspirator 1, a co-conspirator not charged in this Indictment, operated Apogee, Aberdeen, and Incline together with the Defendants. Co-Conspirator 1 was President of Apogee and an owner of Aberdeen and Incline.

e. Beacon Medical Marketing LLC ("Beacon") was a business located in Edison, New Jersey, under common ownership with Apogee.

f. Health Pain Solutions, LLC ("HPS") was a company located in North Ridgeville, Ohio.

g. Mark Belter and Co-Conspirator 2, who owned and operated HPS, were co-conspirators not charged in this Indictment.

h. Marketing Company 1 was a company located in San Diego, California.

i. Marketing Company 2 was a company located in North Carolina.

j. Marketing Company 3 was a company located in Mississippi.

k. RediDoc LLC was a company located in Phoenix, Arizona. RediDoc was a purported telemedicine company doing business throughout the United States. RediDoc was owned and operated by Stephen Luke and David Laughlin, two co-conspirators not charged in this Indictment.

2

## Medicare and TRICARE

l.     Medicare was a federally funded program established to provide medical insurance benefits for individuals age 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who received benefits under Medicare were referred to as "Medicare beneficiaries." Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), part of the United States Department of Health and Human Services.

m.     Medicare was divided into four parts: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug benefits (Part D). Medicare Part D provided coverage for the cost of prescription drugs for individuals on Medicare. Part D coverage was managed by pharmacy benefit managers and other private companies approved by Medicare.

n.     TRICARE was a federal health care benefit program for the United States Department of Defense (DoD) Military Health System that provided health insurance coverage for DoD beneficiaries worldwide, including active-duty military service members, National Guard and Reserve members, retirees, their families, and survivors. The Defense Health Agency, an agency of the DoD, oversaw and administered TRICARE.

o.     Both Medicare and TRICARE (and their pharmacy benefit managers) were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f). "Beneficiaries" were individuals covered by these programs.

3

p.      Insurance Company 1 was a health care insurance company headquartered in Louisville, Kentucky that contracted with Medicare to administer prescription drug benefits.

q.      Insurance Company 2 was a health care insurance company that contracted with Medicare to administer prescription drug benefits.

## Telemedicine

r.      "Telemedicine" refers to the practice of medicine by doctors using telecommunications technology, such as video or telephone, to connect with patients. Telemedicine companies, like RediDoc, hired doctors and other health care providers, purportedly to furnish telemedicine services to patients.

## Terminology

s.      A National Drug Code ("NDC") is a universal product identifier for human drugs in the United States. Each drug has a unique NDC.

4

## The Conspiracy

2.      From in or about January 2017 through in or about September 2020, in Middlesex County, in the District of New Jersey, and elsewhere, defendants

WILLIAM B. WELWART,
ETHAN B. WELWART, and
GARY KACZKA

did knowingly and intentionally conspire and agree with each other and others to commit certain offenses, namely:

a.      To knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefits program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program, as defined by 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347; and

b.      To devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

## Goal of the Conspiracy

3.     The goal of the conspiracy was for WILLIAM B. WELWART, ETHAN B. WELWART, and KACZKA (collectively, the "Defendants") to obtain money from health care benefit programs, including private insurance companies, TRICARE, and Medicare, by submitting and causing the submission of insurance claims for medically unnecessary—but exorbitantly priced—medications.

## Manner and Means of the Conspiracy

4.     To carry out the conspiracy and to effect its unlawful objects, the Defendants, and others, engaged in a variety of means and methods including, among others, those described below.  It was part of the conspiracy that:

a.     The Defendants entered into agreements with marketing companies, including HPS, for the referral of prescriptions to Apogee, and its successors Aberdeen and Incline (together, the "Pharmacies").

b.     The marketing companies, in turn, identified Beneficiaries to target for expensive drugs. These drugs typically included pain creams, scar creams, eczema creams, and migraine medication. The Beneficiaries whom the marketers identified were referred to as "leads." The marketers received Beneficiary information from various sources, including overseas call centers, and the information usually included the Beneficiary's personal and health insurance information.

c.     After identifying leads, the marketers called the Beneficiaries to pressure them to agree to try expensive medications—regardless of medical necessity. These calls were recorded in whole or in part.

6

d.    The Defendants worked with the marketing companies and others to create prescription pads, which contained specific medications for a physician to choose from. The prescription pads almost exclusively contained medications that reliably generated high reimbursements, like pain creams, scar creams, eczema creams, and migraine medication.

e.    To establish and determine which medications would be placed on the prescription pads, the Defendants submitted and directed others to submit false claims to health care benefit programs through a practice known as "test billing." The purpose of "test billing" was to determine how much a health care benefit program would reimburse for a particular formula or medication. This way, the pharmacies and marketing companies could include on their prescription pads medications that would result in high reimbursements from Medicare, TRICARE, and commercial insurance companies. WILLIAM B. WELWART knew about and approved of this practice, and KACZKA carried it out.

f.    As a result of "test billing" and other methods, the Defendants created prescription pads containing particular medications. The Defendants were aware that medications were placed on the prescription pads based on what would yield the most expensive reimbursements, and not on the medical or health needs of any particular patient.

g.    After the Beneficiary agreed to receive the medication, the marketing companies transmitted the Beneficiaries' medical information and portions of the recorded phone calls to telemedicine companies with which the marketing companies had financial agreements. The marketers also sent to the

7

telemedicine companies the pre-marked prescription pads for particular drugs that would yield exorbitant reimbursements.

        h.    The telemedicine companies thereafter paid doctors and other health care providers to approve the pre-written prescriptions that they had received from the marketing companies. The doctors often approved the prescriptions without having had any contact with the Beneficiaries and without making a bona fide assessment that the medications were medically necessary.

        i.    After securing signed prescriptions, typically using the pre-marked prescription pads prepared by the pharmacies and marketing companies, the marketing companies, including HPS, steered the prescriptions to the Pharmacies and other pharmacies around the country that they had relationships with.

        j.    The Pharmacies then sought to fill and dispense the medications, and submitted claims for reimbursement to health care benefit programs. Once the Pharmacies received reimbursement, WILLIAM B. WELWART, ETHAN B. WELWART, Co-Conspirator 1, and others working for the Pharmacies caused a portion of the reimbursements to be sent to the marketing companies as payment for the prescriptions that the marketers had paid the telemedicine companies to generate.

        k.    WILLIAM B. WELWART and ETHAN B. WELWART (together, the "WELWARTS") knew that it was unlawful for the Pharmacies to pay the marketing companies kickbacks to induce the referral of prescriptions. Accordingly, the WELWARTS concealed the reimbursement payments to the marketing companies by transferring money from the Pharmacies' business bank accounts to a

business bank account for Beacon (the "Beacon Bank Account"). The WELWARTS then paid marketing companies, which were located outside of New Jersey, from the Beacon Bank Account, located in New Jersey. These payments consisted of interstate transmission of funds through wire transfer or automated clearing house ("ACH") transactions.

l.    Certain documents also falsely represented that the marketing companies would be paid on an "hourly" basis. But in fact the marketers were paid a percentage of the reimbursements the Pharmacies received per prescription, after the Pharmacies deducted the cost of goods.

m.    The marketing companies regularly questioned the Defendants and the Pharmacies' employees about the status of reimbursements for prescriptions that the marketing companies had steered to the Pharmacies. The WELWARTS knew that the marketing companies sought information about the status of reimbursements because the Pharmacies were paying the marketing companies a portion of the reimbursements in return for the prescriptions that the marketing companies had referred to the Pharmacies.

n.    The Pharmacies' employees generally contacted Beneficiaries to confirm that the Beneficiary would accept the prescription before it was shipped. At times, the Pharmacies' employees could not reach the Beneficiary, or the Beneficiary declined the medication. To ensure that the scheme continued to operate even when the Pharmacies' employees could not confirm that a Beneficiary would accept the medication, the Pharmacies regularly provided the marketing companies with the

names of those Beneficiaries so that the marketers could contact the Beneficiaries again to persuade them to accept the medication.

o.     The marketers employed various strategies to persuade Beneficiaries to accept more medications, including by encouraging the patients to accept automatic refills.  WILLIAM B. WELWART was aware of this strategy and the fact that it would result in Beneficiaries receiving unnecessary and excessive quantities of medication.  For example, in an email dated January 11, 2018, Belter emailed WILIAM B. WELWART and an employee of Apogee (hereinafter "Employee 1"), regarding a strategy to encourage patients to enroll in automatic refill, stating: "My bet is 80-90% of the people getting their prescriptions will say sure on AUTO FILL.  **** If you send cream out and wait 24 days and call and say hey Mr. [Beneficiary] you have a refill available for your prescription pain cream do you need us to send it out. – 80%-90% will say NO I have plenty at the moment. Thank you anyway... SO just by doing this simple step is the differen[ce] in hundreds of thousands of dollars per month. . . This has to be a proess [sic] you do at your pharmacy for all your clients and the increase will be ASTRONOMICAL."

p.     The marketers likewise purposely did not tell the Beneficiaries the names of the prescribing doctors—whom they often did not know—to increase the likelihood that the Beneficiaries would agree to accept the medication. For example, on or about January 15, 2018, Belter emailed WILLIAM B. WELWART and Employee-1, and told them that when Belter called Beneficiaries, he deliberately avoided specifics to increase the likelihood of the Beneficiaries consenting to receive

expensive medications: "I think you might lose some people [Beneficiaries] when you mention a Doctor name they have never heard of."

       q.   Beneficiaries at times complained to the Pharmacies that they did not request or want the medications that they had received. Beneficiaries told the Pharmacies' employees that their doctors had not prescribed the medication, and Beneficiaries' primary care doctors likewise contacted the Pharmacies to question the prescriptions.

       r.   The marketers typically told the Beneficiaries that the medications were at "no cost," regardless of whether the Beneficiary's insurance plan required a co-payment ("co-pay"). The conspirators, including WILLIAM B. WELWART, set up one or more purported "co-pay assistance programs" to cover Beneficiaries' co-pays to persuade the Beneficiaries to accept medications regardless of medical necessity. Although the "co-pay assistance programs" purported to be third-party programs, in fact they were funded and controlled by WILLIAM B. WELWART and his co-conspirators as part of the scheme.

       s.   The Defendants understood that health care benefit programs would frequently stop reimbursing for certain medications because of fraud, waste, or abuse. At times, the Defendants sought to submit as many claims as possible prior to potential changes in insurance coverage. For example, in December 2018, the Defendants identified an opportunity with "foot soak" medication that could be obtained at low cost with high reimbursement. In a December 2018 email, Belter wrote to Co-Conspirator 1: "I have a guy who sent me his script pad for a foot bath combo of medication – says it bills out 100% through [Insurance Company 1]. . . . He

11

says profit is $2,000 per foot bath." Co-Conspirator 1 forwarded the email to KACZKA and WILLIAM B. WELWART. KACZKA responded to Belter: "Hold off on other pharmacies, I like formula, [if] it works out I like us to run with these."

t.     On or about December 16, 2018, Belter wrote in an email to KACZKA, "We do not know what these will bill out at in 2019 and we have been told one of the medications will possibly not be covered?" Belter's email continued: "So can you grab the test patients this morning.  Bill out an [Insurance Company 1] and a [Insurance Company 2] and let me know those numbers and COG [cost of goods]. Then please let me know how many your staff can handle.  We can do well over 100 a day so we can send in 500+ just this week." KACZKA responded that he would "try test run Monday."

u.     KACZKA and Belter thereafter developed instructions for how to use the medication, including dosing quantities, without regard to the needs of any individual patient.  Belter wrote an email on or about December 21, 2018, to KACZKA encouraging KACZKA to process the claims by the end of the year, stating, "I just know from experience . . . insurance could change coverages.  So while we know they are good lets [sic] try to get them in and out." KACZKA responded, "I have a plan and will execute all these scripts before year end . . . . The most important thing we do is get all the billing thru before January 1, which will happen."

v.     The Defendants' conduct drew scrutiny from insurance plans and pharmacy benefit managers. For example, KACZKA received an email from Insurance Company 1 on or about January 4, 2019, which indicated that Apogee had processed over $822,000 in claims for an NDC associated with the "foot soak" scheme

over two days in December 2018. The Insurance Company 1 representative stated: "What your pharmacy processed in 2 days is greater than all the pharmacies in [the Insurance Company 1] network, including regional chains, processed for the entire 2018 for this NDC. I hope you understand that this kind of activity shows up on our radar and we need to ensure the accuracy of the transactions in accordance with CMS guidance as those are Medicare claims." KACZKA forwarded this email to WILLIAM B. WELWART and ETHAN B. WELWART.

      w.     The next day, on or about January 5, 2019, Belter wrote an email to KACZKA stating, "I guess we learned not to bill out more than the entire Country in 2 days ……. Moving forward we will do 15-25 a day spread out…"

      x.     KACZKA, who worked in New Jersey, sent and received various communications in interstate commerce in furtherance of the scheme. For example, KACZKA, from New Jersey, emailed Belter, who was primarily located in Ohio, and representatives of Insurance Company 1, located in Kentucky, in furtherance of the scheme to defraud.

      y.     Over time, insurance plans and pharmacy benefit managers, including Insurance Company 1, stopped doing business with Apogee following audits and investigations. When Apogee lost its ability to submit claims to certain insurance plans and pharmacy benefit managers, the Defendants moved their business from Apogee to Aberdeen and Incline to continue the scheme by concealing who owned and controlled Aberdeen and Incline. To avoid scrutiny, the Defendants sought to spread the claims out between the successor pharmacies and process lower daily volume.

z.    For example, after Apogee was terminated by Insurance Company 1 in or around the end of 2018, the Defendants submitted claims to Insurance Company 1 using Incline and Aberdeen. Insurance Company 1 terminated Aberdeen on or about May 30, 2019. On or about February 4, 2020, in response to a review of Incline claims conducted by Insurance Company 1, a representative from Incline sent an email to a representative of Insurance Company 1 that falsely represented to Insurance Company 1 that Incline had no connection to Apogee.

aa.    In total, Defendants and their co-conspirators caused the submission of claims to health care benefit programs for prescriptions procured through the health care fraud and wire fraud scheme totaling over $33 million.

In violation of Title 18, United States Code, Section 1349.

## COUNTS 2–8
(Health Care Fraud)

5.      Paragraphs 1 and 3–4 of Count 1 of this Indictment are realleged here.

6.      On or about the dates listed below, in Middlesex County, in the District

of New Jersey, and elsewhere, the defendants

WILLIAM B. WELWART,
ETHAN B. WELWART, and
GARY KACZKA

knowingly and willfully executed a scheme and artifice to defraud a health care

benefit program and to obtain, by means of false and fraudulent pretenses,

representations, and promises, money and property owned by, or under the custody

and control of, a health care benefit program in connection with the delivery of and

payment for health care benefits, items, and services:

| Count | Approx. Date | Execution |
|---|---|---|
| 2 | September 20, 2018 | Defendants caused Apogee to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 1 |
| 3 | September 24, 2018 | Defendants caused Apogee to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 2 |
| 4 | November 8, 2018 | Defendants caused Apogee to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 2 |
| 5 | November 27, 2018 | Defendants caused Apogee to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 3 |
| 6 | December 27, 2018 | Defendants caused Aberdeen to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 4 |
| 7 | December 27, 2018 | Defendants caused Aberdeen to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 4 |
| 8 | December 27, 2018 | Defendants caused Aberdeen to submit a claim to Medicare for a medically unnecessary prescription for Beneficiary 4 |

In violation of Title 18, United States Code, Section 1347, and Title 18, United States Code, Section 2.

### COUNTS 9–14
(Wire Fraud)

7.    Paragraphs 1 and 3–4 of Count 1 of this Indictment are realleged here.

8.    On or about the dates listed below, in Middlesex County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, the defendant specified per count did knowingly and with fraudulent intent transmit and cause to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures and sounds:

| Count | Defendant | Date | From | To | Interstate Wire Transmission |
|---|---|---|---|---|---|
| 9 | WILLIAM B. WELWART | May 24, 2018 | Beacon Medical Marketing LLC | Health Pain Solutions LLC | Transfer of approximately $276,192.55 via ACH debit |
| 10 | WILLIAM B. WELWART | June 11, 2018 | Beacon Medical Marketing LLC | Health Pain Solutions LLC | Transfer of approximately $294,574.10 via ACH debit |
| 11 | WILLIAM B. WELWART ETHAN B. WELWART | October 3, 2018 | Beacon Medical Marketing LLC | Health Pain Solutions LLC | Transfer of approximately $188,595.83 via ACH debit |
| 12 | WILLIAM B. WELWART ETHAN B. WELWART | October 26, 2018 | Beacon Medical Marketing LLC | Health Pain Solutions LLC | Transfer of approximately $229,058.12 via ACH debit |
| 13 | WILLIAM B. WELWART | April 16, 2019 | Beacon Medical Marketing LLC | Health Pain Solutions LLC | Transfer of approximately $35,000 via ACH debit |

| 14 | WILLIAM B. WELWART  ETHAN B. WELWART | May 14, 2019 | Beacon Medical Marketing LLC | Health Pain Solutions LLC | Transfer of approximately $18,929.31 via ACH debit |
|---|---|---|---|---|---|

In violation of Title 18, United States Code, Section 1343, and Title 18,

United States Code, Section 2.

## COUNT 15

(Conspiracy to Violate the Anti-Kickback Statute)

9.    Paragraphs 1 and 3–4 of Count 1 of this Indictment are realleged here.

10.   From in or about January 2017 through in or about September 2020, in

Middlesex County, in the District of New Jersey, and elsewhere, defendants

WILLIAM B. WELWART and
ETHAN B. WELWART

knowingly and intentionally conspired and agreed with one another, and with Co-

Conspirator 1, Belter, Co-Conspirator 2, Luke, Laughlin, and others known and

unknown, to commit certain offenses against the United States, namely, to knowingly

and willfully offer and pay remuneration, directly and indirectly, overtly and covertly,

in cash and in kind, that is, kickbacks and bribes, to any person to induce such person

to refer an individual to a person for the furnishing and arranging for the furnishing

of any item and service for which payment may be made in whole and in part under

a federal health care program, contrary to Title 42, United States Code, Section

1320a-7b(b)(2)(A).

## Overt Acts

11.   In furtherance of the conspiracy and to achieve its illegal objectives, the

WELWARTS committed, and caused to be committed, the following overt acts in the

District of New Jersey and elsewhere:

a.    The WELWARTS, through the Pharmacies and Beacon, sent HPS

payments totaling approximately $6,168,155.05, each of which represented a bribe

and kickback to HPS for prescriptions steered to the Pharmacies. These kickbacks

to HPS included the following, on or about the approximate dates listed below:

19

| Date | Approx. Amount |
|------|----------------|
| November 14, 2018 | $185,103.63 |
| November 28, 2018 | $123,775.02 |
| December 14, 2018 | $155,893.33 |
| January 2, 2019 | $212,412.62 |
| February 5, 2019 | $72,429.87 |
| February 20, 2019 | $115,145.69 |
| March 12, 2019 | $21,974.93 |
| March 19, 2019 | $24,738.69 |

b.      The WELWARTS, through Beacon, sent Marketing Company 1 payments totaling approximately $305,574.89, each of which represented a bribe and kickback payment to Marketing Company 1 for prescriptions steered the Pharmacies. These kickbacks to Marketing Company 1 included the following, on or about the approximate dates listed below:

| Date | Approx. Amount |
|------|----------------|
| September 21, 2018 | $15,252.01 |
| October 3, 2018 | $10,325.68 |
| October 26, 2018 | $22,696.39 |
| November 11, 2018 | $19,027.46 |
| November 14, 2018 | $12,370.29 |
| November 28, 2018 | $11,328.06 |
| December 17, 2018 | $9,135.96 |

c.      The WELWARTS, through Beacon, sent Marketing Company 2 payments totaling approximately $1,554,893.85, each of which represented a bribe and kickback payment to Marketing Company 2 for prescriptions steered the Pharmacies. These kickbacks to Marketing Company 2 included the following, on or about the approximate dates listed below:

20

| Date | Approx. Amount |
|------|----------------|
| April 2, 2019 | $15,566.37 |
| April 2, 2019 | $19,252.75 |
| April 16, 2019 | $12,517.83 |
| April 16, 2019 | $14,762.24 |
| May 3, 2019 | $5,097.19 |
| May 7, 2019 | $8,569.37 |
| May 14, 2019 | $7,148.41 |
| May 14, 2019 | $21,690.50 |

d. On or about March 20, 2018, ETHAN B. WELWART sent an email to a representative of Marketing Company 3, a company that referred prescriptions to the Pharmacies in return for kickback payments. ETHAN B. WELWART wrote: "I will be closely monitoring [Marketing Company 3's] scripts both on the billing and pt contact side."

e. On or about April 5, 2018, ETHAN B. WELWART emailed the representative of Marketing Company 3 and stated: "It seems that no matter how many customer service agents we add, more scripts are pouring in.  We are spending a lot of time and resources on a new portal to allow you a window in to our system." In another communication between the representative of Marketing Company 3 and ETHAN B. WELWART on April 5, 2018, the representative wrote to ETHAN B. WELWART: "We have worked very hard fixing insurance info on hundreds of patients, changing our rx pad for better adjudication."

f. On or about April 5, 2019, Belter emailed Co-Conspirator 1 and stated that "[A]t Aberdeen it is slow in build up which I understand you do not want to bill out over a million dollars in 24 hours like Apogee but to process 25+ patients a day which we are not even close to doing should not raise any issues . . . . We need to

21

pick up processing and time getting the[s]e patients processed." Co-Conspirator 1 forwarded this to the WELWARTS stating: "[P]lease see below. I really need the portal at Aberdeen and Incline by next week."

g.    On or about February 25, 2019, Co-Conspirator 1 emailed the WELWARTS a chart showing "Aberdeen payments" for February 1-15, 2019. The chart showed a payment amount of $21,974.93 next to the initials "HPS." On or about March 12, 2019, the WELWARTS paid HPS $21,974.93 from the Beacon Bank Account.

h.    On or about April 16, 2019, WILLIAM B. WELWART transferred $35,000 from Beacon to HPS.

i.    On or about April 17, 2019, Co-Conspirator 1 forwarded the WELWARTS an email chain between Co-Conspirator 1 and Belter discussing what Belter was owed by Apogee. The email chain referenced the $35,000 payment made by WILLIAM B. WELWART on April 16, 2019, in partial satisfaction of what Apogee owed HPS.

j.    On or about May 9, 2019, Co-Conspirator 1 wrote an email to the WELWARTS, and others, summarizing a "Weekly Call." Co-Conspirator 1 wrote: "HPS – doing well is current with new scripts and is owed money for past scripts."

In violation of Title 18, United States Code, Section 371.

## COUNTS 16–22
(Violations of the Anti-Kickback Statute)

12.    Paragraphs 1, 3–4, 9, and 11 of Counts 1 and 15 of this Indictment are realleged here.

22

13.    On or about the dates listed below, in Middlesex County, in the District

of New Jersey, and elsewhere, the defendants specified per count below did knowingly

and willfully offer and pay remuneration, directly and indirectly, overtly and covertly,

in cash and in kind, that is, kickbacks and bribes, to the marketing companies

specified below, to induce such persons to refer an individual to a person for the

furnishing and arranging for the furnishing of any item and service for which

payment may be made in whole and in part under a federal health care program:

| Count | Defendant | Date | Kickback |
|-------|-----------|------|----------|
| 16 | WILLIAM B. WELWART | April 12, 2018 | Transfer of $180,275.69 to HPS |
| 17 | WILLIAM B. WELWART | April 26, 2018 | Transfer $252,725.93 to HPS |
| 18 | WILLIAM B. WELWART | May 11, 2018 | Transfer of $230,745.17 to HPS |
| 19 | WILLIAM B. WELWART ETHAN B. WELWART | November 14, 2018 | Transfer of $185,103.63 to HPS |
| 20 | WILLIAM B. WELWART ETHAN B. WELWART | November 28, 2018 | Transfer of $123,775.02 to HPS |
| 21 | WILLIAM B. WELWART ETHAN B. WELWART | December 14, 2018 | Transfer of $155,893.33 to HPS |
| 22 | WILLIAM B. WELWART | January 2, 2019 | Transfer of $212,412.62 to HPS |

| | ETHAN B.<br>WELWART | | |
|---|---|---|---|

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), and

Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

### Counts 1–22

1.    The allegations in this Indictment are realleged here for the purpose of alleging forfeiture.

2.    Upon conviction of one or more of the Federal health care offenses (as defined in 18 U.S.C. § 24) charged in Counts 1 through 22 of this Indictment, the defendant charged in each such count shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, the defendant obtained that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of each such offense.

### Counts 1, 9–14

3.    Upon conviction of one or more of the wire fraud offenses charged in Counts 1 and 9 to 14 of this Indictment, the defendant charged in each such count shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, the defendant obtained that constitutes or is derived from proceeds traceable to the commission of the each such offense, and all property traceable to such property.

### SUBSTITUTE ASSETS PROVISION
### (Applicable to All Forfeiture Allegations)

4.    If any of the above-described forfeitable property, as a result of any act or omission of the respective defendant:

      a)   cannot be located upon the exercise of due diligence;

25

b)   has been transferred or sold to, or deposited with, a third party;

c)   has been placed beyond the jurisdiction of the court;

d)   has been substantially diminished in value; or

e)   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL

FOREPERSON

VIKAS KHANNA
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

CASE NUMBER: ___23-cr-726 (ES)

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

## WILLIAM B. WELWART,
## ETHAN B. WELWART, and
## GARY KACZKA

# INDICTMENT FOR

18 U.S.C. § 1349, 18 U.S.C. § 1347,
18 U.S.C. § 1343, 18 U.S.C. § 371,
42 U.S.C. § 1320a-7b(b)(2)(A),
18 U.S.C. § 2

A True Bill,

**Foreperson**

VIKAS KHANNA
ATTORNEY FOR THE UNITED STATES ACTING
UNDER AUTHORITY CONFERRED BY 28 U.S.C. § 515

KATHERINE M. ROMANO
ASSISTANT U.S. ATTORNEY
NEWARK, NEW JERSEY
973-353-6095